[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 22.]

THE STATE OF OHIO, APPELLEE, *v*. MOORE, APPELLANT.

[Cite as *State v. Moore*, 1998-Ohio-441.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 96-2204—Submitted October 21, 1997—Decided February 4, 1998.)

APPEAL from the Court of Appeals for Hamilton County, No. C-950009.

———————————

{¶ 1} On the evening of January 14, 1994, defendant-appellant, Lee Edward Moore, Jr., and Jason Holmes abducted Melvin Olinger at gunpoint and forced him into the trunk of his blue Ford Taurus. Moore drove Olinger's car to Mt. Healthy, dropped Holmes off, and picked up Larry Kinley. The two drove Olinger's car to a factory area in Cincinnati, where Moore ordered Olinger out of the trunk, robbed him of his wallet, and shot him in the head, killing him. Moore later admitted committing the crimes but claimed that the shooting was accidental. Moore was subsequently convicted of aggravated murder, kidnapping, and aggravated robbery, and sentenced to death.

{¶ 2} On January 14, at approximately 7:20 p.m., Melvin Olinger, a suburban Chicago businessman, visited his parents in Fairfield. Olinger then went to a funeral home during calling hours for a friend who had passed away. Later, he went to Gina's, a bar, around 9:00 to 9:30 p.m., where he talked with Charlotte James. He told her that he was going to visit his mother that evening before returning to Chicago the next day. Olinger stayed in the bar for about fifteen minutes.

{¶ 3} That same evening, Moore and Jason Holmes drove to Fairfield, intending to steal a car. Moore waited outside Gina's and saw Olinger get out of his blue Ford Taurus and enter the bar. When Olinger returned to his car, Moore confronted him with a gun and told Olinger to get in. Moore drove the Taurus to

the rear of the bar and forced Olinger to climb into the trunk. Moore drove the Taurus to Larry Kinley's house in Mt. Healthy while Holmes followed in Moore's Ford Fairmont.

{¶ 4} Moore and Kinley drove to a store in the Taurus, leaving Holmes behind to babysit. Moore told Kinley how he had stolen the car and that he was going to get it painted and modified. Moore told Kinley that he was driving to the Cumminsville area of Cincinnati to show the car to a friend. Instead, Moore drove to a factory area at 3366 Llewellyn Street. On the way, Moore told Kinley that he was going to kill the man in the trunk. When Kinley asked Moore why he was going to kill the man, Moore responded, "This ain't nothing. * * * We're not going to get caught for it."

{¶ 5} Upon driving into the factory area, Moore headed toward a dumpster. He stopped the car and let Olinger out of the trunk while Kinley remained in the car. Kinley testified that he didn't see what happened because the trunk lid was up, but that he heard Moore tell Olinger to empty his pockets. Kinley testified that Moore directed Olinger to the corner by the dumpster and that he heard Olinger beg and plead to Moore about Olinger's sick mother.

{¶ 6} Kinley heard a gunshot, then Moore jumped into the car. According to Kinley, Moore laughed and asked him, "Did you see his dome get shot off?" After leaving the scene, Moore directed Kinley to take the credit cards out of Olinger's wallet. Kinley said that Moore sounded upset because he had forgotten to ask Olinger for the personal identification number to his Jeanie card.

{¶ 7} In a taped statement to police, Moore claimed that he asked Olinger for his wallet after directing him to the dumpster. When Olinger dropped the wallet and stepped forward, Moore said that he panicked and "accidentally pulled the trigger. But it was an accident. * * * I had a large amount of drinks an' * * * some marijuana. An' it truly truly was an accident."

{¶ 8} Moore and Kinley returned to Kinley's house, where Moore told Holmes what had happened. Moore told Holmes that he planned to keep the Taurus and that Holmes could use his Fairmont any time he wanted. At Moore's request Kinley took the Michigan plates off Olinger's Taurus. Kinley then took one of the plates off Moore's Fairmont and put it on the Taurus.

{¶ 9} The next day, Moore and Kinley went out to get "some stuff." Moore used Olinger's credit card to purchase over $1,000 worth of clothing and jewelry at two J.C. Penney stores in the Cincinnati area. A sales clerk became suspicious and contacted Penney's loss prevention officer. The officer observed two black males place their purchases in the trunk of a blue Ford Taurus with Ohio tags and drive away.

{¶ 10} At approximately 5:30 p.m. on January 20, police apprehended Moore and Kinley as they waited for an order in the drive-through lane of a McDonald's restaurant. Moore was placed in a holding cell at the Mt. Healthy police station. Officers confiscated several items of clothing from Moore which were believed to have been purchased with Olinger's credit card. Shortly after midnight, Moore was advised of his *Miranda* rights and signed a waiver of rights form.

{¶ 11} Moore was then taken to the downtown Cincinnati police station for questioning. Although the weather was cold and snowy, Moore was required to walk a short distance to and from the police car in his stocking feet, since his shoes had been confiscated as evidence. At approximately 6:30 a.m., while "crying a little bit" and sniffling, Moore admitted to police that he had robbed and kidnapped Olinger and that he had shot and killed Olinger. He claimed that the shooting was accidental.

{¶ 12} Based on information supplied by Kinley, police located Olinger's body. The chief deputy coroner determined that Olinger had died of a single

gunshot wound to the head fired from a distance of between six and twenty-four inches away.

**{¶ 13}** The grand jury indicted Moore on three counts of aggravated murder, one count of aggravated robbery, and one count of kidnapping. All counts carried a firearm specification. All three aggravated murder counts carried three death-penalty specifications: (1) aggravated murder to escape detection for kidnapping and/or aggravated robbery [R.C. 2929.04(A)(3)]; (2) aggravated murder committed in connection with kidnapping where Moore either was the principal offender or committed the aggravated murder with prior calculation and design [R.C. 2929.04(A)(7)]; and (3) aggravated murder committed in connection with aggravated robbery where Moore either was the principal offender or committed the aggravated murder with prior calculation and design [R.C. 2929.04(A)(7)].

**{¶ 14}** The defense essentially admitted Moore's involvement in the crimes. It argued that Moore had not formed the specific intent to kill Olinger. After deliberation, the jury found Moore guilty as charged.

**{¶ 15}** Prior to the mitigation hearing, the trial court merged the three death specifications of Count I (aggravated murder committed with prior calculation and design) into one specification: murder to escape detection for kidnapping and/or aggravated robbery. The court also merged the two felony murder counts into one count and merged the three specifications attached to these counts into two: murder during kidnapping and murder during aggravated robbery.

**{¶ 16}** During the mitigation hearing, several witnesses testified on Moore's behalf, and Moore gave a remorseful unsworn statement admitting the wrongfulness of his actions.

**{¶ 17}** The jury recommended death, and the court imposed the death penalty. The court also imposed consecutive prison sentences for Moore's other

convictions. Upon appeal, the court of appeals affirmed the convictions and sentence of death.

{¶ 18} The cause is now before this court upon an appeal as of right.

————————————

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *William E. Breyer,* Assistant Prosecuting Attorney, for appellee.

*Elizabeth E. Agar* and *Julia A. Sears,* for appellant.

————————————

**PFEIFER, J.**

{¶ 19} Moore presents twenty-six propositions of law for our consideration. We have considered all of the propositions of law raised by Moore and have independently reviewed Moore's death sentence for appropriateness and proportionality. For the reasons that follow, we affirm the judgment of the court of appeals and uphold the death sentence.

Pretrial Issues

{¶ 20} In his first proposition of law, Moore argues that he was denied due process when the trial court denied his motion to reassign the trial judge. Judge William J. Morrissey was assigned by lot to Moore's capital case pursuant to Loc.R. 7(H) of the Court of Common Pleas of Hamilton County. He ruled on several pretrial motions and presided at the suppression hearing. On October 31, 1994, Judge Morrissey filed an entry disqualifying himself because he was "[h]eavily involved in other cases." That same day, the common pleas administrative judge reassigned the case to Judge Robert P. Ruehlman.

{¶ 21} Defense counsel filed a motion to reassign the trial judge pursuant to Loc.R. 7 of the Court of Common Pleas of Hamilton County ("Local Rule 7"). Defense counsel asserted that the reassignment by the administrative judge was inappropriate, since Local Rule 7(H) contemplates a separate assignment by lot in death penalty cases.

{¶ 22} Local Rule 7(E) provides that when a judge properly disqualifies himself from a case, the case will be reassigned pursuant to Sections (B) and (C) of Local Rule 7. Section (C) of Local Rule 7 provides that when a date has been set for trial and counsel for the parties acknowledge their readiness to proceed to trial, the administrative judge may assign the case "to any judge of that division who is not engaged in the trial of a cause at that time * * *."

{¶ 23} Moore contends that Section (H) of Local Rule 7 should apply, since it specifically directs that assignments of capital cases be undertaken by lot. However, Section (H) does not provide for reassignment by lot when a judge becomes disqualified from a capital case.

{¶ 24} Moore contends that even assuming that Section (C) applies to this case, that provision was not followed because counsel never acknowledged their readiness to proceed to trial. Nothing in the record indicates that the parties did not acknowledge their readiness to proceed to trial. Defense counsel never raised this issue in their motion for reassignment or during the court session when Judge Ruehlman considered the matter prior to trial. Moreover, nothing in the record suggests that Moore's counsel were unprepared to proceed on the date set for trial. The first proposition of law is rejected.

{¶ 25} In his second proposition of law, Moore argues that the trial court abused its discretion by denying his motion for individual sequestered voir dire. Moore alleges that remarks made by two prospective jurors supporting capital punishment "contaminated" the entire venire. The comments Moore complains of were isolated and their effect on the venire is purely speculative. More important, Moore fails to persuasively demonstrate that he was prejudiced by these remarks.

{¶ 26} The manner of conducting voir dire is within the sound discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710, 723; *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph two of the syllabus. Since no abuse of discretion is apparent, *State v. Maurer* (1984), 15

Ohio St.3d 239, 250, 15 OBR 379, 389, 473 N.E.2d 768, 780, Moore's second proposition of law is rejected.

{¶ 27} In his third proposition of law, Moore complains that the trial court erred in permitting the prosecution to obtain promises from prospective jurors that they could sign a death verdict specifically against Moore. Moore failed to object to these questions and, therefore, has waived all but plain error. *State v. Campbell* (1994*)*, 69 Ohio St.3d 38, 40-41, 630 N.E.2d 339, 344; *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 924-925. Plain error is absent here. Moreover, this court has upheld voir dire questioning where prospective jurors were asked whether they could impose death "upon the defendant" or on "this particular defendant." See *State v. Evans* (1992), 63 Ohio St.3d 231, 249-250, 586 N.E.2d 1042, 1057-1058; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 424-425, 613 N.E.2d 212, 221. Accordingly, the third proposition of law is rejected.

{¶ 28} In his fourth proposition of law, Moore claims that he was denied a fair trial due to errors during voir dire. He propounds four arguments, which we will address in turn.

{¶ 29} First, Moore argues that the death qualification of prospective jurors produced a jury that did not represent a fair cross-section of the community. Apparently, Moore assumes that a jury representing a fair cross-section of the community would include persons "opposed to the death penalty." However, the United States Supreme Court has stated that petit juries are not required to reflect the composition of the community at large and that persons opposed to the death penalty do not constitute a "distinctive group" for purposes of a cross-section claim. *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137. Thus, we have repeatedly upheld the type of death-qualification questioning criticized by Moore. See, *e.g., State v. Steffen* (1987), 31 Ohio St.3d 111, 120-121, 31 OBR 273, 281, 509 N.E.2d 383, 392-393; *Landrum, supra*, 53 Ohio St.3d at 118, 559 N.E.2d at 723; *State v. Grant* (1993), 67 Ohio St.3d 465, 476, 620 N.E.2d 50, 64.

**{¶ 30}** Second, Moore asserts that exclusion of persons opposed to the death penalty results in a jury biased in favor of guilt and in favor of imposing the death penalty. We reject this argument on the authority of *Lockhart v. McCree, supra*.

**{¶ 31}** Third, Moore contends that prospective jurors Warren and Savage were improperly excused for cause because they expressed reservations about the death penalty. Prospective juror Warren was extensively questioned by both parties and the trial judge about whether she could vote to impose a death sentence. She said repeatedly that she would not sign a verdict imposing the death penalty, stating that her views were "religiously based." Prospective juror Savage stated that she could not vote for the death penalty, and indicated that her views against the death penalty would substantially impair her ability to follow her oath and the judge's instructions.

**{¶ 32}** Where the trial court has the definite impression that a prospective juror will be unable to faithfully and impartially apply the law, deference must be given to the trial judge who sees and hears the prospective juror. *State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284-285, citing *Wainwright v. Witt* (1985), 469 U.S. 412, 425-426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841, 852-853. Here, both excused jurors expressed views that would prevent them from fulfilling their duties as jurors. We conclude that the trial court did not abuse its discretion in excusing the jurors for cause. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576, 587; *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O. 2d 409, 414, 280 N.E.2d 915, 920.

**{¶ 33}** Last, Moore asserts that the use of peremptory challenges to excuse prospective jurors who expressed reservations about imposing the death sentence violates *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. Moore's argument is misplaced because the *Witherspoon* holding was substantially altered in *Wainwright v. Witt*, *supra*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 177-178, 17 OBR

414, 417, 478 N.E.2d 984, 989. Moreover, prosecutors can exercise peremptory challenges for any reason except to exclude jurors based on gender or race. See, *e.g., State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419. The fourth proposition of law is rejected.

**{¶ 34}** In his fifth proposition of law, Moore raises two arguments concerning the composition of the venire. First, Moore contends that the trial court erred in refusing a continuance to allow him to present evidence supporting his motion for a reconstituted venire. Moore alleges that the venire was composed unfairly because a large percentage of African-Americans are not registered to vote and therefore only five of the fifty members composing the jury pool were African-Americans. Moore asserted at the beginning of voir dire that such a venire did not represent a fair cross-section of the community, and that use of licensed drivers lists or Social Security numbers would attain a fairer representation from the black community. The court denied Moore's motion for a continuance and overruled his motion for a new venire.

**{¶ 35}** The decision to grant a continuance is within a trial court's discretion. *State v. Claytor* (1991), 61 Ohio St.3d 234, 241, 574 N.E.2d 472, 478. "In order to establish a violation of the fair representative cross-section of the community requirement for a petit jury array * * *, a defendant must prove: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus, following *Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586-587.

**{¶ 36}** Assuming that Moore can prove the first prong of the *Fulton* test, we move to the second prong. He has not adequately proven that African-Americans

9

in Hamilton County are unfairly represented in venires in relation to their number in the community. He merely alleges that in this particular venire, the percentage of blacks in the jury pool did not equal the percentage of blacks in Hamilton County.

{¶ 37} Further, Moore cannot satisfy the third prong of *Fulton*. The use of voter registration rolls as exclusive sources for jury selection is constitutional and "does not systematically, [or] intentionally, exclude any [economic, social, religious, racial, political and geographical group of the community]." *State v. Johnson* (1972), 31 Ohio St.2d 106, 114, 60 O.O.2d 85, 90, 285 N.E.2d 751, 757; *State v. Spirko* (1991), 59 Ohio St.3d 1, 35-36, 570 N.E.2d 229, 265. Thus, the trial court did not err in failing to grant Moore's motion for a new venire or abuse its discretion in failing to grant him a continuance to gather evidence in support of his motion. *Maurer, supra*, 15 Ohio St.3d at 250, 15 OBR at 389, 473 N.E.2d at 780.

{¶ 38} Moore also contends in his fifth proposition of law that the trial court erred in permitting the prosecution to exercise a peremptory challenge against an African-American juror in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. In order to state a prima facie case of purposeful discrimination under *Batson*, an accused must demonstrate (1) that members of a recognized racial group were peremptorily challenged and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313; *State v. Hill* (1995), 73 Ohio St.3d 433, 444-445, 653 N.E.2d 271, 282. If the accused makes a prima facie case of discrimination, the state must then come forward with a neutral explanation. *Id.* at 445, 653 N.E.2d at 282. A trial court's finding of no discriminatory intent "will not be reversed on appeal absent a determination that it was clearly erroneous." *Hernandez*, 63 Ohio St.3d at 583, 589 N.E.2d at 1314.

{¶ 39} During voir dire, the prosecution exercised one of its peremptory challenges against prospective juror Freeman, an African-American woman. The

defense objected, and the trial judge requested the state to justify its peremptory challenge. The judge, following his own rule of practice, requested the prosecution to explain why it had peremptorily challenged Freeman.

**{¶ 40}** The prosecution tried to explain that it did not engage in a pattern of discrimination, since it had exercised "for cause" challenges against three white prospective jurors but not against any black jurors. When pressed for a justification by the trial court, the prosecutor stated that there were a couple of "things that bothered [him] about her [Freeman's] questionnaire."

**{¶ 41}** First, the prosecutor noted that Freeman stated on her questionnaire that she felt that alcoholism or drugs negatively affect a child's development. The prosecutor explained that based on defense questions during voir dire, it was apparent that the defense was going to rely upon alcohol and drug use as a mitigating factor. Second, the prosecutor stated that Freeman indicated on her questionnaire that her uncle was an attorney who had once served as a public defender. Third, the prosecutor noted that Freeman had her arms folded when he had questioned her and that such body language "struck him" as being not receptive to the questions asked by the state.

**{¶ 42}** In ruling that the peremptory challenge of Freeman was not based on race, the court noted that a good attorney looks at body language. The court further explained that it too had sensed a "little hostility" coming from Freeman toward the prosecution. The court also accepted the prosecutor's reasoning that Freeman might be predisposed to the defense and perhaps a little "anti-prosecutor" because her uncle is a defense attorney. We conclude that the trial court's finding of no discriminatory intent was not "clearly erroneous" under *Hernandez,* 63 Ohio St.3d at 583, 589 N.E.2d at 1314. Therefore, we overrule the fifth proposition of law.

### Statement to Police

**{¶ 43}** In his sixth proposition of law, Moore argues that the trial court should have granted his motion to suppress because both his statement and his

waiver of *Miranda* rights were involuntary. In his seventh proposition of law, Moore contends that his confession was the product of police coercion, in that he was deprived of food and water, forced to walk in the snow and slush without shoes, and handcuffed in his cell for three hours. In his eighth proposition of law, Moore asserts that his statement should have been suppressed because police officers ignored him when he requested counsel. We will address these related propositions of law together.

{¶ 44} The transcript reveals conflicting accounts of the events preceding Moore's confession to the police. Sgt. Mike Donathan of the Mt. Healthy police, who was present when Moore was arrested, did not advise Moore of his *Miranda* rights. When Moore arrived at the police station, he was placed in a holding cell. Donathan thought that he had removed the handcuffs from Moore but conceded the possibility that they were not removed.

{¶ 45} Mt. Healthy Police Detective Jeff Armontrout first encountered Moore in the holding cell. Armontrout took several items of clothing and jewelry from Moore as evidence. Armontrout did not tell Moore why he was taking Moore's clothing. Moore was left bare-chested and had to use a blanket in the cell to cover himself. Armontrout testified that no one fed Moore while he was in the holding cell and that Moore never requested anything to eat or drink.

{¶ 46} Dennis Ohmer, the Assistant Police Chief of Mt. Healthy, testified that he saw Moore in the holding cell at around 10:30 p.m. on January 20, 1994, and later transported Moore to the downtown Cincinnati police station shortly after midnight. A Fairfield officer informed Ohmer that he had read Moore his *Miranda* rights and that Moore had signed the waiver-of-rights form. Ohmer stated that Moore had a jacket when he was taken downtown, but was not wearing any shoes. Upon arriving at the Cincinnati police station, Moore stated that he did not want to walk through the slush to get from the car to the station. Ohmer acknowledged that

he made no effort to provide Moore with footwear and that Moore was required to walk approximately thirty feet through slush and snow without shoes.

{¶ 47} Officer Michael Tiernan of the Fairfield police was present when Moore was arrested and did not smell any alcohol or marijuana odors in Moore's vehicle. Moore was not glassy-eyed and his speech was not slurred. Tiernan advised Moore of his *Miranda* rights at around 12:10 a.m., approximately six hours after Moore's arrest, and Moore was given the opportunity to read the rights form himself. Moore indicated that he understood his rights and then signed the waiver form. Tiernan stated that Moore did not ask to speak to an attorney or ask to call his parents or family.

{¶ 48} Tiernan interviewed Moore. During that interview, Moore confessed to "accidentally" killing Olinger. Moore did not ask for food during the interview, but was provided water one or two times. Occasional breaks were taken during the interview, which lasted over an hour and a half, and Moore appeared to be clear-headed throughout.

{¶ 49} David Feldhaus, an investigator with the Cincinnati Police Homicide Unit, assisted Tiernan in the interview of Moore. Feldhaus testified that Moore was not handcuffed during the interview. Feldhaus stated that he asked Moore whether he wanted coffee, pop, or anything to eat, and that Moore indicated that he just wanted water. At the beginning of the interview, Feldhaus stated that the questioning concerned the death of Olinger and that he showed Moore the *Miranda* rights form. Moore answered affirmatively when asked whether he understood his *Miranda* rights, and he acknowledged his signature at the bottom of the form, which had been signed nearly five hours earlier. Feldhaus stated that Moore did not request an attorney or ask to make a phone call to his family.

{¶ 50} Moore's testimony conflicted with the officers' testimony in several important respects. Moore testified at the suppression hearing that on the day he was arrested, he had last eaten at 9:00 a.m. and that he had smoked a six-inch-long

"cigar" of marijuana. Moore claimed that he told Tiernan that he wanted an attorney when Tiernan advised him of his right to counsel. Moore stated that Tiernan ignored his request for counsel and just kept reading the rights form. Moore asserted that he was never offered food or water while incarcerated in the Mt. Healthy holding cell. He was, however, able to get a drink of water from a fountain before he was taken to the downtown Cincinnati police station.

{¶ 51} Moore testified that he was handcuffed with his hands behind his back for over three hours prior to his interview with Tiernan and that he was not offered any water during that time. When the interview began, Moore requested and received water. Moore stated that Feldhaus never offered him anything to drink or eat and that there were no candy bars or coffee in the interview room.

{¶ 52} Moore stated that he requested an attorney a second time when Feldhaus showed him the rights form and waiver at the beginning of the interview. According to Moore, Feldhaus ignored him. Moore stated that he requested an attorney at least three times while in custody. He claimed that he was never charged with aggravated murder or informed that he was a suspect in an aggravated murder investigation. Moore stated that he signed the waiver form because it asked whether he understood his rights.

{¶ 53} At the close of the hearing, the trial court denied Moore's motion to suppress his statement to police. In doing so, the trial court resolved any conflicts in testimony in favor of the state and against Moore. Accordingly, we will defer to the trial court's ruling with respect to the weight of the evidence and credibility of the witnesses. See *State v. Scott* (1980), 61 Ohio St.2d 155, 161, 15 O.O.3d 182, 186, 400 N.E.2d 375, 380; *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542, 547.

{¶ 54} The issues of whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct. However, both standards are

determined by the totality of circumstances. *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854.

{¶ 55} The evidence supports the trial court's findings that Moore was properly advised of his *Miranda* rights and that he understood those rights when he signed the waiver. An accused's signed waiver form is strong proof that the waiver was valid. *Id.* at 261, 527 N.E.2d at 854*; North Carolina v. Butler* (1979), 441 U.S. 369, 374-375, 99 S.Ct. 1755, 1758-1759, 60 L.Ed.2d 286, 293.

{¶ 56} Several aspects of the events leading to Moore's confession are troubling. The police officers did not provide Moore with food or drink while he was in the holding cell, they required Moore to walk in the snow and slush in subfreezing temperatures in his stocking feet, and they kept Moore's hands cuffed behind his back for over three hours while he sat in the interview room. Nevertheless, based on the totality of circumstances, these troubling aspects do not lead us to conclude that Moore's "will was overborne" or that "his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Otte* (1996), 74 Ohio St.3d 555, 562, 660 N.E.2d 711, 719; *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484. See, also, *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. Accordingly, we conclude that Moore made a knowing, voluntary, and intelligent waiver of his constitutional rights. The sixth and seventh propositions of law are rejected.

{¶ 57} The credible evidence submitted at the suppression hearing indicates that Moore was properly advised of his constitutional right to counsel and that he validly waived that right. In deference to the trial court's ruling, we find that there is no credible evidence that Moore ever requested an attorney either before or during his custodial interrogation. See *Minnick v. Mississippi* (1990), 498 U.S. 146, 147, 111 S.Ct. 486, 488, 112 L.Ed.2d 489, 494; *Edwards v. Arizona* (1981), 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386; and *State v.*

*Knuckles* (1992), 65 Ohio St.3d 494, 605 N.E.2d 54, paragraph one of the syllabus. We reject the eighth proposition of law.

Trial Issues

**{¶ 58}** In his ninth proposition of law, Moore asserts error in the admission of five photographs of Olinger's body that he claims were cumulative, repetitive, and gruesome. Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *Maurer, supra*, 15 Ohio St.3d at 264, 15 OBR at 401, 473 N.E.2d at 791. Nonrepetitive photographs in capital cases, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. *Id.* at paragraph seven of the syllabus.

**{¶ 59}** Three of the five photographs objected to, State Exhibits 9, 20, and 22, depict Olinger's frozen body as it was found at the murder scene with the snow brushed off. None of the three could be termed gruesome. While there are minor differences among the three, they are arguably repetitive. Nevertheless, Moore's substantial rights were not affected. In light of the abundant evidence of Moore's guilt, he was not unduly prejudiced.

**{¶ 60}** The admission of the two autopsy photographs, State Exhibits 21 and 23, was proper. Both photographs illustrated the coroner's testimony and the testimony of the firearm expert and were probative of Moore's purpose to kill. The photographs were not repetitive or cumulative. We reject the ninth proposition of law.

**{¶ 61}** During the guilt-phase testimony of police investigator David Feldhaus, the court permitted the jury to "follow along" on transcripts prepared by police of Moore's tape-recorded statement. In his tenth proposition of law, Moore contends that unduly repetitious presentations of evidence unfairly emphasize the contents and prejudicially lend the evidence added weight. This court noted in *State v. Waddy* (1992), 63 Ohio St.3d 424, 445, 588 N.E.2d 819, 835, that "[w]here there

are no 'material differences' between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error." The defense never challenged the accuracy of the transcripts, nor do we find prejudicial error. The tenth proposition of law is rejected.

{¶ 62} In his twelfth proposition of law, Moore asserts that the guilt-phase jury instruction based on the statutory definition of "reasonable doubt" (R.C. 2901.05) was improper. We summarily reject the twelfth proposition of law on the authority of *State v. Frazier* (1995), 73 Ohio St.3d 323, 330, 652 N.E.2d 1000, 1008.

Penalty Phase Issues

{¶ 63} In his eleventh proposition of law, Moore contends that the prosecutor's trial tactics and arguments during the penalty phase, when considered collectively, deprived him of a fair trial. Moore specifically cites four groups of prosecutorial comments that he claims constituted misconduct. The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885.

(1) Facts not in evidence

{¶ 64} During closing argument at the penalty phase, the prosecutor made the following statements: "[W]hen he [Olinger] got out [of the trunk] and saw [the gun] * * *, and he saw where he was, * * * he knew what was coming"; "[T]hink a minute what Melvin Olinger went through during that kidnapping"; and "[M]aybe there was a moment of hope for Mr. Olinger. You know. 'They're going to let me out.'" Moore objected to the first comment but not the other two, which are waived absent plain error. *Slagle, supra*, 65 Ohio St.3d at 604, 605 N.E.2d at 924-925. Moore contends that the statements impermissibly used facts not in evidence to appeal to the passions and prejudice of the jury.

**{¶ 65}** Prosecutorial comments continually referring to what the victim was thinking are improper because they ask the jury to speculate on facts not in evidence. *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077. While the prosecution is entitled to a certain degree of latitude in summation, see *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 493, 433 N.E.2d 561, 566, comments such as those complained of here are speculative and therefore improper. *Combs, supra.* Even so, these comments did not deprive Moore of a fair sentencing determination or prejudicially affect any other substantial right. See *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

(2)  Comment on unsworn statement of defendant

**{¶ 66}** The prosecutor stated, "Their last piece [of mitigation] is the defendant's statement, unsworn statement, so he does not have to face any cross-examination or face any tough questions from the prosecutors. And you can consider that when you consider his credibility as a witness." Moore contends that this statement was impermissible. See *DePew, supra*, 38 Ohio St.3d at 285, 528 N.E.2d at 554.

**{¶ 67}** In *DePew*, we held that "the prosecution may comment that the defendant's statement has not been made under oath * * *, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." *Id.* at paragraph two of the syllabus.

**{¶ 68}** In *Lorraine, supra*, 66 Ohio St.3d at 419, 613 N.E.2d at 218, we stated that the prosecution's comments concerning the lack of cross-examination when a defendant makes an unsworn statement during the mitigation phase exceeded the limits of *DePew*. More recently, in *State v. Davis* (1996), 76 Ohio St.3d 107, 120, 666 N.E.2d 1099, 1110, this court found that prosecutorial comment on the lack of cross-examination was "consistent with *DePew*." We conclude that the prosecutor's comments did not prejudicially affect a substantial right.

(3) Alleged denigration of defense counsel

{¶ 69} Moore claims that the prosecutor denigrated the role and trial tactics of defense counsel and suggested that defense counsel were attempting to hide the truth. Specifically, Moore cites two instances during closing argument that he claims tainted his trial. In the first instance, the prosecutor stated during the guilt-phase closing argument that the defense was attempting to throw a "smoke screen" in front of the jury. In the second instance, the prosecutor said that the defense was trying to "confuse the jury" because both the facts and the law were against the defendant.

{¶ 70} Moore did not object to either comment and thus waived all but plain error. Neither comment amounts to outcome-determinative plain error. *Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Contrary to Moore's argument, these remarks did not rise to the level of prejudice found by this court in *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203, 207.

(4) Using nature and circumstances of crime as aggravating circumstance

{¶ 71} Moore argues that the prosecutor was allowed to tell the jury that the nature and circumstances of the crimes were aggravating circumstances to be weighed against the mitigation evidence presented. The prosecutor asked the jury to "[t]hink about the coldness and premeditation in which Melvin Olinger was stalked. * * * These are the aggravating circumstances that you're balancing against mitigation. What did Mr. Olinger do to deserve this." While the prosecutor's comments tended to raise coldness and premeditation as aggravating circumstances, the error was not outcome-determinative. *Long, supra*.

{¶ 72} The prosecutor stated, "Can you imagine the abject terror Melvin Olinger has at this point" and "Was he begging for his life?" While both comments invited the jury to speculate on facts not in evidence and thus may constitute error under *Combs, supra*, 62 Ohio St.3d at 283, 581 N.E.2d at 1077, neither comment materially prejudiced Moore. See *State v. Campbell, supra*, 69 Ohio St.3d at 41,

630 N.E.2d at 345; *State v. Gumm* (1995), 73 Ohio St.3d 413, 422, 653 N.E.2d 253, 263-264.

{¶ 73} The prosecutor stated, "These are all the facts that are aggravating circumstances to be weighed against the total void of mitigation presented to you today." Under our decision in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus, this comment was clearly improper because it elevates the nature and circumstances of the crime to the level of aggravating circumstances. However, no objection was raised to this statement, and we find it was not prejudicial.

{¶ 74} As noted above, none of the prosecutor's comments taken separately prejudiced any substantial rights. While some of the comments were improper, even when viewed collectively, we conclude that they did not prejudice any substantial rights of Moore. The eleventh proposition of law is rejected.

{¶ 75} In his thirteenth proposition of law, Moore argues that counsel were ineffective at the penalty phase in failing to prepare adequately with witnesses, and that such failure resulted in a surprise revelation fatal to his case. Reversal of a conviction on the grounds of ineffective assistance of counsel requires defendant to show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.

{¶ 76} On cross-examination, Moore's court-appointed psychologist, Dr. David Chippone, testified that Moore had admitted that he had murdered Olinger to escape detection. Moore argues that counsel could not have spent enough time with Dr. Chippone because if they had, they would not have called him as a witness. Moore contends that other facts support the conclusion that counsel were "unready to proceed" with the penalty phase: that the court pressed the parties to finish the mitigation phase by the following Wednesday (a week later) to accommodate a

juror who had to leave town; that defense counsel had met with Dr. Chippone only once prior to the conclusions of the guilt phase of the trial, and had not, at that point, discussed his testimony with him; and that the wife of one of the defense counsel was expecting a child in a few days.

{¶ 77} Moore's arguments under this proposition are purely speculative and do not compel a reversal of his death sentence. That defense counsel had not discussed Dr. Chippone's testimony with him at the time the guilty verdict was issued does not mean that the several days available prior to the penalty phase were inadequate. The fact that a juror had to leave town by the following Wednesday does not necessarily mean that the penalty phase was rushed improperly.

{¶ 78} Moore's arguments appear to assume that defense counsel did not begin to prepare for the mitigation phase until the guilty verdict was announced. There is nothing in the record to support such an assumption.

{¶ 79} With respect to Dr. Chippone's testimony, defense counsel attempted to rehabilitate this witness, or at least to have him explain the meaning of his comments made during cross-examination. It is clear that part of Dr. Chippone's testimony did not aid Moore's efforts to secure a life sentence. When the prosecutor asked Dr. Chippone on cross-examination whether he had ever questioned Moore as to why he killed Olinger, Dr. Chippone said that Moore "had a difficult time explaining it * * *. He said he was afraid the man would identify him." The prosecutor then asked, "So he [Moore] shot him so he would not be identified?" Dr. Chippone replied, "That's the implication." Defense counsel's objection was overruled. The prosecutor then asked, "[W]hen [Moore] gave that statement to the police about dropping the wallet and the gun just went off and it was an accident, [Moore] told you that he made that up?" Dr. Chippone replied, "That is correct."

{¶ 80} On redirect, defense counsel undercut the damage of the prior exchange by asking Dr. Chippone, "[T]hat Moore indicated that the man dropped

the wallet, but that's the part * * * that he made up to police, that the man [Olinger] actually did not drop the wallet that [Moore] claimed that [Olinger] did?" Dr. Chippone replied, "Yes."

{¶ 81} Moore has not established that his defense counsel's preparation for mitigation fell below an objective standard of reasonable representation. Given the paucity of mitigating evidence available on Moore's behalf, he called four witnesses and presented evidence for only half a day, the short period of time between the verdict and the beginning of the penalty phase (four days) may not be an inadequate time in which to prepare. Moreover, nothing indicates that counsel did not prepare for the penalty phase prior to the close of the guilt phase. In fact, the evidence produced during the penalty phase indicates the opposite.

{¶ 82} We conclude that Moore has not demonstrated "a reasonable probability that, were it not for counsel's errors, the result of the trial court would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Accordingly, we reject the thirteenth proposition of law.

{¶ 83} In his fourteenth proposition of law, Moore contends that the trial court erred in failing to instruct the jury on drug/alcohol impairment and residual doubt as mitigating factors. However, "voluntary drunkenness and drug use are not mitigating factors." *Slagle*, 65 Ohio St.3d at 614, 605 N.E.2d at 931. Voluntary intoxication is a "weak" mitigating factor entitled to little or no weight. *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 145, 652 N.E.2d 710, 714. A residual doubt instruction is not required. See, *e.g., State v. Garner* (1995), 74 Ohio St.3d 49, 56-57, 656 N.E.2d 623, 632. Moreover, trial courts are not required to instruct the jury on individual, nonstatutory mitigating factors which can be considered by the jury under R.C. 2929.04(B)(7). *Landrum*, 53 Ohio St.3d at 122, 559 N.E.2d at 728. The fourteenth proposition of law is rejected.

**{¶ 84}** In his fifteenth proposition of law, Moore claims error in the court's instruction and verdict form referring to the jury's verdict as a "recommendation." Moore failed to object; thus, all but plain error is waived. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332. Moreover, the term "recommendation" accurately reflects Ohio law and does not diminish the jury's sense of responsibility. See, *e.g., State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81. There is no error, plain or otherwise. The fifteenth proposition of law is rejected.

**{¶ 85}** In his sixteenth proposition of law, Moore again claims error in the court's "reasonable doubt" instruction implementing the statutory definition in R.C. 2901.05. (See above, discussion of the twelfth proposition of law.) Moore waived all but plain error by failing to object. *Underwood, supra*. Moreover, use of the statutory definition of reasonable doubt in jury instructions during both phases of a capital trial has been uniformly upheld, beginning with *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus. Even though the court's reference to the "truth of the charge" may not be the preferred language for a penalty phase reasonable doubt instruction, any error was harmless and not outcome-determinative. *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 96; *State v. Spirko*, 59 Ohio St.3d at 17, 570 N.E.2d at 248. The sixteenth proposition of law is rejected.

**{¶ 86}** In his seventeenth proposition of law, Moore contends that the trial court's sentencing opinion improperly considered the nature and circumstances of the offense as a nonstatutory aggravating circumstance. Specifically, Moore refers to the part of the sentencing opinion that states, "There is nothing more cold blooded, premeditated or calculated than to search for an out-of-state victim like Mr. Olinger. Mr. Olinger innocently walked into the trap set up by the defendant and as a result was kidnapped, robbed, and murdered. Mr. Olinger was herded into

the trunk of his car, driven several miles in sub-freezing temperatures to a dark, desolate area and then was shot in the head."

{¶ 87} Earlier in the sentencing opinion, the trial judge had recited the death penalty specifications to each count and had referred to those specifications as the "aggravating circumstances." The passage of the sentencing opinion cited by Moore above was nothing more than a brief recitation of the underlying facts. It was not a recitation of circumstances weighed against the mitigating factors. The sentencing opinion did not indicate that the nature and circumstances of the offense were being weighed as aggravating circumstances against the mitigating factors. If anything, the court cited the facts to support its finding that the aggravating circumstances outweighed the mitigating factors, which is permissible. See *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

{¶ 88} Moore also argues that the trial court considered the heinousness of the crimes as an aggravating factor. It did not; the court merely reviewed the nature and circumstances of the crimes, as it is required to do, in order to determine whether the death penalty was appropriate. *State v. Jester* (1987), 32 Ohio St.3d 147, 153, 512 N.E.2d 962, 969.

{¶ 89} Moore argues that the trial court's sentencing opinion gave insufficient consideration to valid mitigating factors. However, consideration of the extent to which alcohol and drug impairment is a legitimate mitigating factor is a matter for the individual decisionmaker. The seventeenth proposition of law is rejected.

Miscellaneous Issues

{¶ 90} The eighteenth proposition of law asserts that the trial court was without authority to impose imprisonment to be served consecutively to a death sentence. We rejected this argument in *Campbell,* 69 Ohio St.3d at 52, 630 N.E.2d at 352, and *State v. Bies* (1996), 74 Ohio St.3d 320, 325, 658 N.E.2d 754, 760. As

noted in both cases, the prison sentence is rendered moot by the execution of the death sentence. The eighteenth proposition of law is rejected.

{¶ 91} In his twentieth proposition of law, Moore submits that the proportionality review process of R.C. 2929.05 does not comport with constitutional requirements. This argument has been rejected numerous times, see, *e.g., State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus, and may be summarily rejected. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

{¶ 92} In his twenty-first proposition of law, Moore argues that the use of an aggravating circumstance which merely repeats an element of the underlying crime is unconstitutional and fails to narrow the class of persons who are eligible for the death penalty. Moore claims that while *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568, held this to be permissible, *Lowenfield* is distinguishable due to differences between Ohio's and Louisiana's death penalty statutes. We have repeatedly rejected this argument. See, *e.g., State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, paragraph two of the syllabus. The twentieth proposition of law is rejected.

{¶ 93} In his twenty-second proposition of law, Moore contends that since there was only one victim in this case, the court's submission to the jury of more than one aggravated murder count tainted the jury's sentencing recommendation. Moore asserts that it cannot be determined whether the inclusion of the second count of aggravated murder affected the jury's decision to recommend the death penalty. Prior to the penalty phase, the trial court merged the two felony murder counts into one count and submitted two aggravated murder counts to the jury: (1) aggravated murder committed with prior calculation and design and (2) felony murder. Two aggravated murder charges involving the same victim are to be merged for sentencing purposes. See *State v. Huertas* (1990), 51 Ohio St.3d 22,

28, 553 N.E.2d 1058, 1066; *State v. Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N.E.2d 902, 913.

{¶ 94} The trial court erred in sentencing Moore to death on both aggravated murder counts. Such an error is procedural and harmless beyond a reasonable doubt. *State v. Brown*, 38 Ohio St.3d at 317-318, 528 N.E.2d at 538. A merger of the death sentences as part of this court's independent assessment can cure any errors that taint the jury's sentencing verdict. See *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70, 82. The twenty-second proposition of law is rejected.

{¶ 95} In his twenty-third proposition of law, Moore asserts that the court erred in submitting to the jury both alternatives to the aggravating circumstances set forth in R.C. 2929.04(A)(7). See *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744. At the beginning of the penalty phase, the trial court merged all three specifications to Count I (murder with prior calculation and design) into one specification: murder to escape detection for another offense. The two felony-murder counts were merged into one and the three specifications to each of the felony-murder counts were merged into two specifications: murder during kidnapping and murder during aggravated robbery. Thus, the trial court properly merged the duplicate specifications. See *Jenkins*, *supra*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus.

{¶ 96} With regard to the court's instructing the jury on both principal offender and prior calculation and design, such an instruction is proper if the alternatives are given to the jury disjunctively in the same specification. *Cook, supra*, 65 Ohio St.3d at 527, 605 N.E.2d at 82-83. The court erred in not instructing the jury to be unanimous in agreeing on which alternative Moore was guilty of. Such error is harmless, since the guilty verdict on Count I indicated unanimous agreement that Moore committed the murder with prior calculation and design. See

*State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653 N.E.2d 242, 248. The twenty-third proposition of law is rejected.

{¶ 97} In his nineteenth proposition of law, Moore claims that there was insufficient evidence to support his aggravated murder conviction and death sentence. In addition, he claims that both the conviction and sentence were against the manifest weight of the evidence. When reviewing a claim of insufficient evidence, the relevant inquiry is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573-574; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not have reached the conclusion reached by the trier of fact. *Id.* at 273, 574 N.E.2d at 503. See, also, *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus. The evidence in this case satisfies this standard.

{¶ 98} Moore admitted to police that he and Jason Holmes drove to the Hamilton area on the night of January 14, 1994 to steal a car. Moore admitted that he stole Olinger's car at gunpoint and that he made Olinger ride in the trunk while he drove the car to Mt. Healthy to pick up Larry Kinley. Moore told Kinley that he and Holmes had robbed Olinger and that Olinger was locked in the car's trunk.

{¶ 99} Moore told Kinley he was going to kill Olinger. When Kinley asked why, Moore replied, "Fuck him[.] * * * This ain't nothing[.] * * * We're not going to get caught for it." Upon arriving at the factory in Cumminsville, Moore directed Olinger to get out of the trunk and empty his pockets. Moore then shot Olinger in the head; it was estimated that the gun was fired from a distance of no more than thirty inches. When Moore got back in Olinger's car, he was laughing and asked Kinley, "Did you see his dome get shot off? * * * Yes, his brains on the wall."

**{¶ 100}** Moore instructed Kinley to empty Olinger's wallet and take out the credit cards. Moore expressed disappointment that he had forgotten to ask Olinger for the personal identification number to his Jeanie card. The next day, Moore purchased over $1,000 worth of clothing and jewelry at two J.C. Penney stores using Olinger's credit card.

**{¶ 101}** Police specialist David Feldhaus testified that, during an interview, Moore claimed that the shooting of Olinger was accidental. Feldhaus also testified that Holmes and Kinley had told him that it was "Lee Moore's intention to kill [Olinger] right from the beginning." Kinley told Feldhaus that their intention was to shoot Olinger and that "they were trying to think of a place to go shoot him."

**{¶ 102}** Construing this evidence in a light most favorable to the state, a rational factfinder could have found that Moore's aggravated murder convictions and death sentence were supported by sufficient evidence. Moore's argument that his convictions and death sentence were against the manifest weight of the evidence must also fail. This court does not ordinarily evaluate the manifest weight of the evidence in cases evaluated by the courts of appeals. See *State v. Tyler*, 50 Ohio St.3d at 33, 553 N.E.2d at 589, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652, 661-662. Compare *State v. Smith* (1997), 80 Ohio St.3d 89, 102-103, 684 N.E.2d 668, 683-684. The nineteenth proposition of law is rejected.

**{¶ 103}** The twenty-sixth proposition of law asserts that the cumulative effect of errors in this case denied Moore a fair and impartial trial and therefore that imposition of the death penalty is arbitrary. Though a particular error might not constitute prejudicial error by itself, a conviction may be reversed where the cumulative effect of the errors deprives the defendant of a fair trial. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus. The number of errors in this case does not compel invocation of *DeMarco*. We conclude that Moore received a fair trial and that any errors were

harmless or nonprejudicial. Accordingly, the twenty-sixth proposition of law is rejected.

{¶ 104} In his twenty-fourth proposition of law, Moore attacks the constitutionality of Ohio's death penalty scheme. The same seven-part argument raised by Moore has been rejected by this court several times, and we summarily reject it here. See *Steffen*, 31 Ohio St.3d at 125, 31 OBR at 285-286, 509 N.E.2d at 396; *Beuke*, 38 Ohio St.3d at 38-39, 526 N.E.2d at 285; and *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309.

{¶ 105} In his twenty-fifth proposition of law, Moore argues that the proportionality review process is unconstitutional on federal constitutional grounds independent of that required by R.C. 2929.05. (See above, discussion of the twentieth proposition of law.) A similar argument has been rejected by this court because there is no federal constitutional requirement for proportionality review in capital cases. *Jenkins*, 15 Ohio St.3d at 175-176, 15 OBR at 320-321, 473 N.E.2d at 278, discussing *Pulley v. Harris* (1984), 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29. The twenty-fifth proposition of law is rejected.

Independent Review and Proportionality

{¶ 106} Having considered the propositions of law, we must now independently review the death penalty for appropriateness and proportionality. After independent assessment, we find that the evidence supports beyond a reasonable doubt the aggravating circumstances that Moore murdered Melvin Olinger while committing aggravated robbery and kidnapping. R.C. 2929.04(A)(7). In addition, the evidence supports beyond a reasonable doubt the aggravating circumstance that Moore killed Olinger to escape detection or apprehension for kidnapping and robbery. R.C. 2929.04(A)(3).

{¶ 107} The following character and background information was produced during mitigation. Moore was the youngest of eight children and the only son of his parents, who divorced when Moore was around six years old. Moore's mother

was described by several witnesses as "overprotective" and "very strict," and his father as permissive. Moore wanted to play sports in school, but his mother did not allow him to out of fear he would get hurt. Moore did not have a father-son relationship with his father and did not look forward to his visits with him.

{¶ 108} As a youngster, Moore was small in stature and was picked on, teased, and bullied by neighbor children and schoolmates, in part due to the fact that he was always well dressed and introverted. Moore did not always apply himself at school and flunked fourth and ninth grades. After flunking fourth grade, Moore was switched from Central Baptist School to the local public school, where his problems with being bullied and teased began and continued to the tenth grade. Items of clothing were often taken from him by others. In school, Moore was suspended for fighting, and he was once caught with brass knuckles on the school bus. Even so, Moore rarely fought back and would refuse to talk about the teasing and bullying.

{¶ 109} Moore began using alcohol and marijuana at the age of fifteen and later dropped out of school. At times, he spent as much as $350 a week on marijuana. He worked at several entry-level jobs but did not last long at any of them. Even after he began working, Moore was the target of teasing and was beaten up on several occasions.

{¶ 110} While growing up, Moore was considered somewhat special in his family, a "golden child." His material needs were satisfied, and he never really wanted for anything. Moore wasn't required to do chores. Moore's sister considered him to be spoiled and sheltered.

{¶ 111} Several witnesses testified on Moore's behalf, including an older neighbor friend and Moore's sister and mother. Michael McDaniel, Sr. had known Moore since he was around eight years old. McDaniel chronicled several instances where Moore had been beaten up for no apparent reason. He described Moore as a "child in fear" and a "loner." According to McDaniel, Moore is remorseful and

ashamed of what he did to Olinger. In addition, he testified that Moore has "accepted Christ."

{¶ 112} Moore's older sister, Robin Thrasher, noted that their mother was "always working" at her job at General Motors and that their father had problems with alcohol. When Moore went to live with his father at around age seventeen, he was given "too much freedom." Moore had expressed remorse to her about what he had done.

{¶ 113} Moore's mother, Georgia Moore, asked the jury to spare her son's life, noting that Moore had rededicated himself to the Lord as a vessel to warn other young men not to get involved with drugs and alcohol. Georgia Moore expressed feelings that she had failed as a mother and that this is her fault because she was "too strict."

{¶ 114} Dr. David Chippone, a clinical psychologist with the Court Clinic, interviewed Moore on five different occasions and described Moore as very polite, fairly calm, and cooperative throughout the interviews. Dr. Chippone testified about the teasing and bullying and stated that he believed Moore began encountering difficulties in school when he started "hanging with the * * * wrong crowd." The fact that Moore was alcohol- and drug-dependent could have affected his personality. The IQ test Dr. Chippone performed on Moore placed him in the fiftieth percentile, which indicates that Moore is of average intellectual ability. Dr. Chippone opined that Moore is capable of being productive given the right structured environment, such as a prison environment. He also stated that Moore has "potential that obviously wasn't realized."

{¶ 115} Moore gave an extensive unsworn statement in which he expressed sorrow and remorse for his actions against Olinger. He asked Olinger's family to forgive him and stated that he would understand if they did not. Moore stated that he had truly accepted God in his heart and that he could make a difference in other

men's lives based on "this terrible mistake I made." He also stated that he still believed the shooting "was an accident."

{¶ 116} Also offered in mitigation were letters Moore had written to each of his parents in which he tried to explain what had led him to do what he did and expressed sorrow and remorse for the crimes he had committed.

{¶ 117} Upon a review of the evidence presented in mitigation, we find that Moore's character and background are entitled to some, but very little, weight in mitigation.

{¶ 118} The nature and circumstances of the offense reveal nothing of mitigating value. The victim neither induced nor facilitated the murder, R.C. 2929.04(B)(1) and (2), nor was Moore under duress, coercion, or strong provocation. R.C. 2929.04(B)(2). The record does not suggest that Moore lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. R.C. 2929.04(B)(3).

{¶ 119} We find that the youth factor of R.C. 2929.04(B)(4) is entitled to some weight because Moore was nineteen years old at the time the offenses were committed. We find that Moore's lack of a significant history of prior criminal convictions is entitled to some weight. R.C. 2929.04(B)(5). Moore was the principal offender; therefore, R.C. 2929.04(B)(6) is inapplicable.

{¶ 120} Under R.C. 2929.04(B)(7), several aspects should be accorded weight in mitigation. Moore's expressions of remorse are entitled to modest weight. His voluntary drunkenness and drug abuse could have affected his personality, according to Dr. Chippone. This court has held that voluntary drunkenness and drug use are not mitigating. See *Slagle*, 65 Ohio St.3d at 614, 605 N.E.2d at 931. Also mitigating is the apparent change in Moore's personality since the offenses were committed and his capability of being productive in prison.

**{¶ 121}** Weighing the evidence presented in mitigation against the aggravating circumstances, we conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

**{¶ 122}** We correct the decisions of the courts below by merging the two sentences of death imposed on Moore into one death sentence. See *Cook, supra,* 65 Ohio St.3d at 526-527, 605 N.E.2d at 82.

**{¶ 123}** The death penalty imposed in this case is both appropriate and proportionate when compared with capital cases combining murder with kidnapping, see, *e.g.*, *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253, and *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524; and murder with aggravated robbery, see, *e.g.*, *State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253, and *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293.

**{¶ 124}** For all of the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

———————————————